■    In the Matter of BUTTERLY & GREEN, INC., et al., Petitioners, v. JOHN P. LOMENZO, as Secretary of State of the State of New York, Respondent.— Proceeding by licensed real estate brokers and salesmen, pursuant to CPLR article 78 to review respondent's determination dated January 26, 1973, which, after a hearing, (1) held (a) that petitioners had demonstrated untrustworthiness as such licensees (Real Property Law, § 441-c) and (b) that the corporate petitioner had also violated subdivision 5 of section 442-e of the Real Property Law (failure to supply information) and (2) imposed (a) a penalty of a 30-day suspension of petitioners' licenses or, in the alternative, a fine of $50 upon each of the petitioners and (b) a further and indefinite suspension of the licenses of the corporate petitioner and its representative broker, petitioner Klines, pending submission of proof satisfactory to respondent that there has been compliance with two specified requirements concerning their advertising.    Petition granted to the extent that the determination is modified, on the law, (1) by annulling so much thereof as imposed the further and indefinite suspension of the licenses of petitioners Butterly & Green, Inc. and Norman Klines, with the related requirements concerning advertising, and (2) by reducing the other penalties (suspensions, with fines as alternatives) to a reprimand to each petitioner.    As so modified, determination confirmed, without costs, and matter remanded to respondent for issuance, service and filing of the reprimands as provided in subdivision 2 of section 441-c of the Real Property Law.    Subdivision 5 of section 442-e of the Real Property Law requires that licensed real estate brokers or salesmen who come under investigation by respondent shall, on the latter's request, supply any information requested as to business practices or methods.    In the case at bar, petitioners Butterly & Green, Inc. and Klines concededly refused to give respondent information requested of them by an investigator of respondent. While this was a technical violation of the law, it is clear that the refusal was premised on the advice of counsel in the light of the fact that a prior unrelated proceeding was pending for which petitioners' records had already been subpoenaed.    Furthermore, in refusing the request, these petitioners referred the investigator to their counsel.    In our view, since the information requested appears to have been the subject of another legal proceeding, these petitioners were not acting unreasonably in relying upon the advice of counsel, particularly where the investigator was asked to see their counsel (see *Matter of Kreitsek* v. *Department of State of State of N. Y.*, 28 A D 2d 721).    With respect to that part of the determination which imposed a further and indefinite suspension upon the corporate petitioner and its representative broker, apparently because of the nature of their advertising, we note that the affidavit of complaint did not charge that these petitioners had engaged in selective advertising.    In the absence of notice of such a charge,

it was error for respondent to rely upon any matter concerning such advertising and to impose a penalty seemingly related thereto (*Matter of Drago* v. *Lomenzo*, 36 A D 2d 742). While the finding of respondent as to demonstrated untrustworthiness is supported by substantial evidence, we believe that that finding cannot, by itself, support the penalties imposed, that, therefore, the penalties were excessive and an abuse of discretion, and that a reprimand as to each petitioner would have been appropriate. Hopkins, Acting P. J., Christ, Brennan and Benjamin, JJ., concur; Shapiro, J. (dissenting in part). Since the majority memorandum of this court does not detail the record facts, I find it necessary to delve into the record at some length, to show the basis for my partial dissent. Petitioners are Butterly & Green, Inc., a licensed real estate brokerage firm; Norman Klines, the corporation's representative broker; Margaret Allen, also a licensed real estate broker; and Philip Goldstein and Eugene Steiner, licensed real estate salesmen, employed by Butterly & Green, Inc. They were sent a notice of hearing by respondent, directing them to answer a complaint charging violation of article 12-A of the Real Property Law. Attached to the notice was an affidavit of Sol Plotkin, a Senior License Investigator of the Department of State. The affidavit, *inter alia*, states that on or about April 9, 1972, Philip Goldstein and Margaret Allen engaged "in activities designed to discourage white persons from purchasing a house in Laurelton, an inter-racial community"; that Goldstein had made statements that "the value of the homes were lower due to the presence of black residents and schools with black students"; and that Mrs. Allen pronounced Laurelton "unsafe for a woman due to its inter-racial community." The affidavit further states that "such statements were allegedly made with the consent and knowledge of Steiner and Klines" and that unequal racial treatment existed in that a procedure had been designed to have black persons first seen by Steiner prior to referral to a salesman, whereas white persons were directly assigned to a salesman. A hearing on the charges was held before a designated Hearing Officer whose decision, confirmed by respondent, sustained the charges and determined that petitioners, by reason thereof, had demonstrated untrustworthiness within the meaning of section 441-c of the Real Property Law and that Butterly & Green, Inc. had also violated subdivision 5 of section 442-e of that law.[1] The penalty imposed was alternatively a 30-day suspension of petitioners' licenses or a fine of $50 each, with a further and indefinite period of suspension of the licenses of Butterly & Green, Inc. and Klines (applicable also to all their future license applications or renewals) until they would submit proof to respondent's satisfaction of compliance with the following: "1. That when Butterly & Green, Inc. inserts a home for sale advertisement in a newspaper that has a limited circulation or that is printed in a foreign language or that caters to any specific ethnic, racial, religious, social, fraternal, economic or otherwise identifiable group, that it will on the same day insert the same advertisement, using the same amount of lineage and the same size type, in an English language newspaper of

---

1. The violation of subdivision 5 of section 442-e (part of art. 12-A) resulted from the fact that the investigator making inquiry of Klines and Steiner "as to their practices with respect to interviewing prospective purchasers of both the white and black race regarding real property in Laurelton, New York" (as averred in the investigator's affidavit) was refused information regarding such practices, but, since I agree with my brethren that the violation was at best technical and should be excused, I will not comment further thereon.

wide distribution catering to the general public, and 2. That when such home for sale, so being advertised, is located in the Laurelton area then there will be included in such advertisement words or phrases pointing out the advantages and beneficial aspects and attributes of the area and/or the desirability of it as a community in which to live." Respondent based his determination on findings that (1) neither Goldstein's nor Steiner's testimony as to rotation in assignment of salesmen was credible in view of the short period of time (between 12:30 and 1:20 P.M.) in which all the persons testifying, black and white, had entered petitioners' real estate offices, the two black couples first seeing Steiner in the rear office and three of the four white couples immediately seeing Goldstein; (2) Allen and Goldstein had made disparaging statements designed to discourage white persons from purchasing homes in Laurelton, Goldstein "by voice reflections" [sic] conveying that Laurelton "as an integrated area was not a desirable place in which to live"; (3) all the petitioners had engaged in a method of operation to discourage whites and to encourage blacks to purchase homes in Laurelton, aided in the latter case by advertisements in black newspapers which stressed FHA mortgage availability; and (4) this method of operation was harmful to Laurelton as an integrated community and affirmative corrective action was necessary. In *Matter of Stork Rest.* v. *Boland* (282 N. Y. 256, 267), the court said: "Where there is conflict in the testimony produced before the Board, where reasonable men might differ as to whether the testimony of one witness should be accepted or the testimony of another witness be rejected, where from the evidence either of two conflicting inferences may be drawn, the duty of weighing the evidence and making the choice rests solely upon the Board. The courts may not weigh the evidence or reject the choice made by the Board where the evidence is conflicting and room for choice exists." That is precisely the situation here and I therefore agree with the majority opinion that we may not interfere with respondent's findings.[2] I come now to the point of departure from my colleagues. They are of the opinion that the part of respondent's determination which "imposed the further and indefinite suspension of the licenses of petitioners Butterly & Green, Inc. and Norman Klines, with the related requirements concerning advertising" is not based upon any charge in the complaint and that "in the absence of notice of such a charge, it was error for respondent to rely upon any matter concerning [selective] advertising and to impose a penalty seemingly related thereto", citing *Matter of Drago* v. *Lomenzo* (36 A D 2d 742).[3] The conclusion of the majority in this proceeding in that

2. This conclusion does not apply to the finding with respect to the refusal to give information, since we are upholding respondent's factual determination as to that, but are holding that the refusal was, as a matter of law, excusable.

3. *Drago* does not support the conclusion of the majority in this proceeding. There, although the charges were violations of article 12-A of the Real Property Law, by (1) the petitioner's employment of an unlicensed person as a real estate salesman and (2) blockbusting, the Secretary of State, in addition to suspending the petitioner's real estate broker's license for six months, extended the suspension until such time as he would submit a statement that he had terminated the use of the trade name O'Drago Realty, because such use was "confusing to the public and inimical to their welfare" (p. 743) which was conduct in no way constituting any essential part of the activities charged. In the instant case the charge is "unequal treatment to prospective purchasers predicated upon the color of the person", involving both discouraging of white persons from purchasing a home in an interracial com-

regard sustains petitioners' contention that without an allegation in the complaint that they had violated any regulation in reference to the placement of advertisements they could not be found to have used advertisements in furtherance of a discriminatory design. If the matter of Butterly & Green's advertisement in the *Amsterdam News* was, indeed, a different subject than that contained in the affidavit of complaint against petitioners, it would clearly have been improper for respondent to receive evidence with regard thereto. But it is my view that the evidence dealing with the advertisement was not an additional charge, but simply proof that Butterly & Green had followed the practice charged and set forth in the complaint of discouraging would-be white purchasers and encouraging would-be black purchasers of dwellings in Laurelton. As I see it, there can be no reasonable dispute with the conclusion that proof of the publication of the advertisement in the *Amsterdam News* tended to sustain the charge of a practice of discriminatory treatment of white as against black potential home buyers, a practice which was stated in the notice of hearing as being the basis of the charge of untrustworthiness and which, since it was in violation of State law and policy, was a factor which properly could be considered by the licensing authority in determining untrustworthiness (*Matter of Diona* v. *Lomenzo*, 26 A D 2d 473, 476, 477). In *Diona* the court said (p. 476), "A real estate broker deals in a commodity whether it be residential housing or commercial buildings, and licensees should be required to deal openly and fairly with the public when information is sought from them". Telling diametrically opposite stories to blacks and whites as to the nature of the neighborhood and its schools can hardly be characterized as dealing "openly and fairly with the public." Nor can there be any question that proof of a pattern of advertising the availability of FHA mortgages, but only in advertisements placed in publications directed to a Negro readership, and making no mention of this to white inquirers, served to help establish the validity of the charges made against petitioners. Thus, in my opinion, the receipt of evidence with respect to the *Amsterdam News* advertisements and their intended purpose was proper. Petitioners also attack respondent's decision on another ground. They contend that his determination that the licenses of Butterly & Green and Klines be further suspended until they submit sworn proof that when Butterly & Green, Inc. inserts a home-for-sale advertisement in a newspaper of "limited circulation or that is printed in a foreign language or that caters to any specific ethnic, racial, religious, social, fraternal, economic or otherwise identifiable group" it will on the same day insert the same advertisement in an "English language newspaper of wide distribution catering to the general public" can be satisfied only by petitioners' inserting the same advertisement in newspapers with a city-wide circulation like the *Daily News*, the *New York Times*, the *New York Post* or the *Long Island Press*, which, they say, is a "prohibitively expensive" requirement and thus tantamount to a penalty the imposition of which is beyond the power possessed by respondent. The short answer to this contention is that the purpose of the requirement is not to impose a penalty but to prevent continued discriminatory placement of home-for-sale advertisements and to provide a remedy against the past pattern of discriminatory placement of such advertisements. Respondent's power to impose conditions designed to prevent continuance of patterns of

---

munity and special treatment of black possible purchasers there. Petitioners' publication of advertisements carrying special inducements only in a newspaper with a predominantly black circulation clearly supports the charge of unequal racial treatment. It is in no way a new or different charge.

"untrustworthy" conduct is no longer open to dispute (*Matter of Gold* v. *Lomenzo*, 29 N Y 2d 468). In that case the court said (p. 479): "Appellant suggests that although respondents may legitimately order a suspension, no authority exists for the imposition of conditions on its duration. We disagree. It is, of course, true that no specific authorization is to be found in the statute. However, given the general power to suspend licenses, there is an inherent power to impose conditions (*Matter of Edelstein* v. *Department of State*, 16 A D 2d 764). Such a power is not unlimited, but rather must be restricted by a requirement that conditions be reasonable and relate to the broker's professional activities as to matters which are within respondents' official province and area of control." Here the condition imposed, aside from the question of cost, is clearly related to petitioners' professional activities and involves a matter within respondent's official province and area of control, to wit, advertising which has a racially discriminatory effect. In *Matter of Chiaino* v. *Lomenzo* (26 A D 2d 469, 472–473) the Appellate Division, First Department, said: "It is apparent from the context in which the term 'untrustworthiness' appears in the statute that the Legislature intended the Secretary of State to be vested with a wide discretion in determining what should be deemed untrustworthy conduct. (Cf. *Matter of Edelstein* v. *Department of State*, 16 A D 2d 764; cf. *Matter of Abel* v. *Lomenzo*, 25 A D 2d 104, *supra*; *Matter of Tegeler* v. *Department of State*, 23 A D 2d 917; *Matter of Frank* v. *Department of State*, 14 A D 2d 139; *Matter of Smith* v. *Department of State*, 3 A D 2d 954; *Matter of Scheidecker* v. *Department of State*, 242 App. Div. 119, mod. on rehearing 242 App. Div. 891.) This is as it should be for his is the obligation of protecting the public against wrongdoing or incompetency." (See, also, *Matter of Fitzsimons* v. *Department of State*, 34 A D 2d 996, where this court upheld the restoration of a real estate broker's license, suspended for untrustworthiness, conditioned upon the suspended broker's making restitution of a portion of a commission he had improperly withheld.) The contention that the condition imposed requires Butterly & Green to undertake unduly expensive advertising, even if correct, is without merit since it was its discriminatory practices that made necessary the imposition of the sanction imposed by respondent. It seems to me perfectly proper for respondent, as a remedial device to insure against continued discriminatory advertising by Butterly & Green, Inc., in a publication directed to a particular ethnic group, such as the *Amsterdam News*, to require that such advertising be stripped of its potentially discriminatory effect by being accompanied by an identical advertisement in a newspaper addressed not to an ethnic group but to the general public.[4] One

4. The quite evident and laudable purpose of respondent was to prevent "blockbusting", a problem which has been considered by this court in *Matter of Drago* v. *Lomenzo* (36 A D 2d 742, *supra*). In *Drago* we were faced with a classic case of blockbusting. The offending real estate broker had hired a person to telephone homeowners in a certain area soliciting their houses for sale and paid her $100 for each listing which resulted in a sale. It was found by the Hearing Officer that this employee had telephoned a homeowner, asked him if he wanted to sell his home and said, "You know the neighborhood is changing." The charge of untrustworthiness was that the employee had engaged in conduct designed to generate fear and panic among resident homeowners that the community was undergoing a racial change, conduct which constituted blockbusting. Antiblockbusting legislation is designed to meet the problem arising because certain dealers in real estate had found that,

other matter requires comment. As hereinabove stated, respondent's determination also directs that when Butterly & Green advertises a home for sale in the Laurelton area, such advertisement must include "words or phrases

---

when an area in a community which had formerly been exclusively white in composition began changing over, the white owners could often be panicked into selling at low prices because of fear that the neighborhood would become largely black. These dealers would promote such panic, buying houses in the area at sacrifice prices and then reselling them to blacks who, because so much of the market for housing was often barred to them by widespread patterns of racial exclusion, would pay high prices for such housing as was available for sale to them. Thus, the practice called "blockbusting" involves two evils. First, the sellers who were panicked would, in effect, be defrauded, not receiving the fair market value of the homes they were selling in haste in their flight from the neighborhood. (See *Matter of Abel* v. *Lomenzo,* 25 A D 2d 104, 105, where the court said that 19 NYCRR 175.17, "the so-called block-busting rule", seeks "to prohibit the practice of soliciting sales of residential property on grounds of the loss of value of the properties due to a prospective or present entry into the neighborhood of homeowners of a different race or origin" and that "Its object is to prevent the cheating of a property owner by inducing him to sell his property because it will probably become less desirable or valuable because of a prospective change in the racial composition of the neighborhood.") Second, the blockbuster's prophecy as set forth in *Abel* becomes a self-fulfilling one, for, as frightened whites flee, what starts as a movement toward racially mixed housing ends as resegration, an all-white neighborhood quickly shifting to an all-black one. It is for this reason that antiblockbusting provisions appear almost always in laws directed against discrimination in housing. (See Executive Law, § 296, subd. 3; U. S. Code, tit. 42, § 3604.) In *Drago* this court had to deal with what appeared to be a case of the aspect of blockbusting against which title 42 (§ 3604, subd. [e]) of the United States Code is directed, inducing panic selling in order to buy dwellings from white homeowners at low prices because of their fear and to resell at high prices to blacks. But in the instant case we are faced only with a pattern of discouraging white buyers and encouraging black buyers, with no claim or proof that petitioners are themselves earning extra profits by doing any buying and reselling. But even without any evidence of direct inducing of panic selling, it would appear that the necessary effect of a pattern of discouraging white buyers while encouraging black buyers would be to increase the percentage of black home-ownership in the portion of Laurelton which is still integrated, thereby increasing the pressure on whites to sell and move elsewhere, with a consequent increase in the turnover in housing in the area, an increase which would normally enhance the business and commission income of brokers handling houses in the area, as do petitioners increase the percentage of black homeownership in the portion of Laurelton by making the area on "the side of Merrick" which "was 50 percent white and 50 percent black", and which was described by the saleswoman petitioner to a witness as "going", similar to the other side which she described as "all gone". The reason the statutory bans on blockbusting are included in the statutes directed against housing discrimination is that blockbusting, aside from its quasi-fraud aspects, both interferes with the stability of existing integrated neighborhoods and results in the expansion of segregated housing by promoting resegregation of neighborhoods which have begun to become integrated.

pointing out the advantages and beneficial aspects and attributes of the area and/or the desirability of it as a community in which to live." Although petitioners make no specific mention of this condition in their brief, their omission to do so probably arises from the concentration of their attack on the requirement governing the newspapers in which their advertisements are to be placed. However, while conceding respondent's good faith in imposing such a requirement, I can find no statutory authority for a limitation which, by prescribing what must be included in petitioners' advertisement, clearly interferes with their First Amendment freedom-of-press rights in a manner which is in no way justifiable as necessary to avoid the clear and present danger to society that the antiblockbusting statute and regulations seek to prevent (cf. *Schenck* v. *United States*, 249 U. S. 47, 52; *Thomas* v. *Collins*, 323 U. S. 516, 531–532). When governmental power is used to dictate the contents of an advertisement of a home for sale for purposes of promoting sales in one area rather than others, it clashes with the freedom of expression which the First Amendment of our Federal Constitution was designed to protect (*Shuttlesworth* v. *Birmingham*, 394 U. S. 147, 151) and which was made applicable to the States by the Fourteenth Amendment (*Lovell* v. *Griffin*, 303 U. S. 444, 450; *Cantwell* v. *Connecticut*, 310 U. S. 296; *Shelton* v. *Tucker*, 364 U. S. 479, 487).[5] Respondent's determination should therefore be modified in accordance with the views above expressed.

---

5. See, also, *Pittsburgh Press Co.* v. *Pittsburgh Comm. on Human Relations* (413 U. S. 376) where the Supreme Court of the United States affirmed an order of the Commonwealth Court of Pennsylvania modifying and affirming an order of the Court of Common Pleas, Allegheny County, affirming an order of the Pittsburgh Commission on Human Relations directing the Pittsburgh Press Company to cease and desist from publishing help-wanted advertisements under column headings indicating which positions were available for males and which for females. The Commonwealth Court's modification narrowed the scope of the order to allow the Pittsburgh Press Company to carry advertisements in sex-designated columns for jobs exempt from the antidiscrimination provisions of the ordinance which the commission was seeking to enforce. The Supreme Court upheld the commissions's order, as modified, on the ground that it was "clear and sweeps no more broadly than necessary" (p. 390). In the instant case the portion of respondent's order which requires Butterly & Green to include language touting the advantages of homes in Laurelton clearly sweeps "more broadly than necessary" and therefore fails to meet the test set up in *Pittsburgh Press* (*supra*). To be contrasted with this portion of respondent's order is the remedial provision requiring Butterly & Green, if it again publishes any advertisement in a publication directed toward a particular ethnic group, to publish the identical advertisement in a newspaper addressed to the general public. That provision deals only with the *circulation* to be accorded the advertising, not its *contents*. Its effect is solely to insure that Butterly & Green will not, as it has in the past, direct its published listings of homes for sale to one ethnic group instead of to the general public. Thus, it is a limited step needed to remedy petitioners' past discriminatory practices which in no way sweeps "more broadly than necessary," involving only the issue of discriminatory circulation of advertisements and in no way seeking to compel inclusion in Butterly & Green's advertisements of any specific content affecting the desirability of homes in Laurelton.